Jeffrey W. Leppo (Bar No. 0001003)
Ryan P. Steen (Bar No. 0912084)
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
jeffrey.leppo@stoel.com
ryan.steen@stoel.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SHELL OFFSHORE INC., a Delaware corporation, and SHELL GULF OF MEXICO INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>GREENPEACE, INC., a California corporation, and JOHN and JANE DOES 1-20,<br><br>Defendants. | Case No.: 3:15-cv-00054 RRB<br><br>DECLARATION OF DAVID GEORGE |

DAVID GEORGE declares as follows:

1. My name is David George. I have first-hand experience with, and personal knowledge of, the facts and matters discussed in this declaration.

2. I am the Maritime Assurance Manager responsible for the Maritime Safety of all vessels supporting the Arctic operations of Shell Gulf of Mexico Inc. ("SGOMI") and of Shell Offshore Inc. ("SOI") in Alaska. Both SGOMI and SOI indirectly are wholly owned subsidiaries of Shell Oil Company. In this declaration, SGOMI and SOI are sometimes collectively referred to as "Shell."

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 RRB    - 1

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
Main (206) 624-0900  Fax (206) 386-7500

3. I have been employed by Shell or Shell affiliates in various Maritime capacities for a total of 34 years. During my time at Shell, I have served up to and including the rank of Chief Officer on product, crude, and liquid natural gas tankers. I began my career as a professional seaman in 1972, when I joined Shell Tankers UK Ltd as a Navigating Cadet, becoming Third Officer upon completion of four years training and then subsequently Second Officer, before attaining the rank of Chief Officer. During this time, I was responsible for numerous duties, including navigation watchkeeping, cargo management, operational safety, and crew management. From 1993 to the present, I have been employed by Shell in various shore-based positions, including Ship Quality Assurance Assessor, Marine Superintendent for Shell's U.S. West Coast Maritime operations, Maritime Auditor of Shell's Global Maritime businesses, Global Ship Quality Assurance Manager, Manager of Governance and Assurance, and, presently, as the Maritime Assurance Manager for the Alaska Venture. My present role also encompasses my responsibilities as subject matter expert for Maritime Safety in the Alaska Venture and its maritime assets. Over the last 22 years, I have been in Maritime Standards and Assurance positions where safety management has been a critical component in ensuring that safe, efficient, and environmentally responsible operations are executed.

4. My time away from Shell included two periods: 1977-1979, when I worked away from the oil and gas industry in the United Kingdom retail industry; and 1985-1992, when I pursued higher education in the Maritime field followed by three years employment as a Senior Lecturer in Maritime Studies at the University of Plymouth. In 1985, I obtained my Masters Certificate of Competency (unlimited tonnage) from the United Kingdom, which is recognized by the U.S. Coast Guard as an accreditation to serve as master of oceangoing motor vessels. My Masters Certificate includes oil tanker and gas tanker endorsements.

5. During the 2015 open water season, Shell intends to conduct exploration activities on federally managed Outer Continental Shelf ("OCS") oil and gas leases located approximately 60 to 75 miles offshore of the northwestern coast of Alaska in the Chukchi Sea. Shell's 2015 Arctic exploration program represents a carefully planned and complex undertaking involving numerous vessels, two drilling rigs, hundreds of personnel, and multiple onshore facilities.

6. Attached to this Declaration as Exhibit 1 are maps depicting the location of the Shell leases where 2015 exploration drilling is planned.

7. Attached to this Declaration as Exhibit 2 is a logistics resource map for Shell's 2015 Arctic exploration program.

8. Attached to this Declaration as Exhibit 3 are copies of excerpts of Shell's Environmental Impact Assessment ("EIA"), which generally describe Shell's planned 2015 Arctic exploration program. Some details of the actual exploration program may differ from the EIA excerpts, which are intended as a general description of the planned 2015 activities.

9. Attached to this Declaration as Exhibit 4 are documents describing the supporting vessels to be used in Shell's 2015 Arctic exploration program.

10. Attached to this Declaration as Exhibit 5 is a copy of Shell's Drilling Ice Management Plan for the 2015 program.

11. Attached to this Declaration as Exhibit 6 are copies of excerpts from Shell's final Revised Outer Continental Shelf Lease Exploration Plan, Chukchi Sea, Alaska.

## SHELL'S 2015 ARCTIC EXPLORATION DRILLING FLEET

12. The drilling vessels that are planned to be used for 2015 exploration drilling in the Chukchi Sea are the *Noble Discoverer* and the *Polar Pioneer.*

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

13. The *Noble Discoverer* is a self-propelled drilling unit and the *Polar Pioneer* is a harsh environment semi-submersible Mobile Offshore Drilling Unit ("MODU"). In 2012, the *Noble Discoverer* successfully conducted exploration drilling operations in the Chukchi Sea. The *Polar Pioneer* is owned and operated by Transocean, which has spent numerous years drilling in the Norwegian Arctic. In 2015, both the *Noble Discoverer* and the *Polar Pioneer* have completed shake-down preparatory activities in the South China Sea. Descriptions of the *Noble Discoverer* and the *Polar Pioneer* are provided in Exhibit 6.

14. During Shell's 2015 exploration drilling season, the *Noble Discoverer* and the *Polar Pioneer* will each be attended by numerous vessels. These vessels will be used for ice management, anchor handling, refueling, resupply, water sample collection, and oil spill response in the unlikely event that is necessary. Oil spill response vessels, with several attendant workboats, containment boom, and recovery equipment, will be in the project area when drilling into subsurface liquid hydrocarbon-bearing formations. The location of these response vessels will be either close to the rigs as necessitated by their response time needs or in Kotzebue Sound. The Arctic Containment System ("ACS") is intended to be located in Kotzebue Sound throughout the drilling season. The support vessels, aircraft, and infrastructure that will be used in Shell's 2015 Arctic program are described in greater detail in the attached Exhibits 3 and 4.

## MOBILIZATION OF FLEET TO ALASKA

15. In 2015, the *Noble Discoverer* conducted drilling preparation activity in Malaysia. The *Noble Discoverer* left Malaysia on March 10, 2015, and is in transit to waters of the U.S. Exclusive Economic Zone, to Territorial waters of the United States, and to the Port of Seattle, before proceeding to the Chukchi Sea.

16. The *Polar Pioneer* was also conducting drilling preparation activity in Malaysia. On March 11, 2015, the *Polar Pioneer* left Malaysia and is onboard the heavy lift vessel *Blue Marlin* in transit to waters of the U.S. Exclusive Economic Zone, to Territorial waters of the United States, and to the Port of Seattle, before proceeding (with tow assist) to the Chukchi Sea.

17. The support vessels identified in Exhibit 4 are currently located in various places all over the world, including locations in Finland, Louisiana, Washington, and Alaska. Mobilization of all of these vessels will occur throughout the spring of 2015 (and in some cases has already begun), with all vessels scheduled to arrive at their planned mobilization and load-out destinations at various dates in May and June 2015. Depending on their current locations, these vessels will take various routes in transit to Alaska that will include transit through U.S. jurisdictional waters in the Gulf of Mexico and the Pacific Ocean (including Puget Sound).

18. The speeds of the vessels identified in Exhibits 4 and 6 while in transit through U.S. waters will generally range from 3 to 15 knots. Some of these vessels will transit to Alaska via tow, including the drilling rig *Polar Pioneer* and the barges *Klamath*, *Tuuq*, *Arctic Endeavor*, and *Arctic Challenger*. The stopping distances and navigational capabilities of each of the vessels identified in Exhibits 4 and 6 vary based upon their physical dimensions, traveling speeds, location, and weather conditions. The safe navigation of each of these vessels through U.S. waters requires that vessel masters and crews have the ability to operate the vessels — without interference — according to established procedures and protocols, and in compliance with U.S. Coast Guard requirements.

19. Any actions by Greenpeace activists to attempt to follow, block, board, or interfere with the safe navigation and operation of Shell's contracted vessels would present serious and unacceptable safety risks. For example, if a Greenpeace vessel comes within close

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 RRB          - 5

proximity of a vessel in transit, the risk of collision is very high because it is difficult for a larger ship to take evasive action to avoid an imminent collision. This potential danger is compounded when the transiting vessel is under tow because the length of the towline and speed of the vessels restrict their ability to maneuver, including stopping, which can be hampered if the towing/towed vessels are prevented from executing the operation in a safe and efficient manner. If sudden evasive action is taken by the towing vessel, perpendicular forces can overstrain the towing equipment and result in capsize of the tug. This "pendulum effect" can render the towed vessel temporarily uncontrolled, increasing the risk of collision, potential damage from broadside seas, and, if in confined waters, grounding. The risks associated with the boarding of a vessel in transit present obvious and serious dangers to human life.

20. Based on the vessel specifications, anticipated vessel speeds in U.S. waters, vessel operating capabilities, and presence or not of a tow assist, in my best professional judgment, each of the vessels involved in Shell's 2015 Arctic exploration program will require the following minimum distances (extending around and below the vessel) free from inference by Greenpeace while in transit to ensure safe and unimpeded transit to their respective locations in the Pacific Northwest and in Alaska. In order to allow for the safe and effective operation of the vessels identified in Exhibits 4 and 6, the "safety zones" described below should take effect immediately and should remain in effect until Shell begins its exploration activities on or about July 1, 2015. At that time, new safety zones should become effective, as described in the "Exploration Program Activities" section below.

      a. *Noble Discover*: 1000 meters (m).

      b. *Polar Pioneer*: 1000 m.

      c. *Nordica*: 500 m.

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 RRB    - 6

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
Main (206) 624-0900   Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900   Fax (206) 386-7500*

      d. *Fennica*: 500 m.

      e. *Tor Viking II*: 500 m.

      f. *Ross Chouest*: 500 m.

      g. *Harvey Explorer*: 500 m.

      h. *Harvey Champion*: 500 m.

      i. *Harvey Supporter*: 500 m.

      j. *Harvey Sisuaq*: 500 m.

      k. *Aiviq*: 500 m; 1000 m when towing.

      l. *Nanuq*: 500 m.

      m. *Guardsman*: 500 m; 1000 m when towing.

      n. *Ocean Wind*: 500 m; 1000 m when towing.

      o. *Ocean Wave*: 500 m; 1000 m when towing.

      p. *Corbin Foss*: 500 m; 1000 m when towing.

      q. *Lauren Foss*: 500 m; 1000 m when towing.

      r. *Barbara Foss*: 500 m; 1000 m when towing.

      s. *Sea Prince*: 500 m; 1000 m when towing.

      t. *Montana*: 500 m; 1000 m when towing.

      u. *Klamath*: 500 m; 1000 m when under tow.

      v. *Arctic Challenger*: 500 m; 1000 m when under tow.

      w. *Arctic Endeavour*: 500 m; 1000 m when under tow.

      x. *Tuuq*: 500 m; 1000 m when under tow.

      y. *Unalaq* (landing craft): 500 m.

      z. *American Trader*: 500 m; 1000 m when towing.

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 RRB         - 7

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
Main (206) 624-0900  Fax (206) 386-7500

  aa. *Benjamin Foss*: 500 m.

  bb. *King C* (crew boat): 500 m.

  cc. *Marika* (resupply tanker): 1000 m.

  dd. TBA (resupply tanker): 1000 m.

21. Each of the above-listed safety zones would be reduced to 100 m for vessels transiting through piloted waters (i.e., narrow channels). Outside of piloted waters, the above-listed safety zones would present no risks to any Greenpeace vessels because the safety zones are small and reasonable in comparison to the areas available for navigation in open waters. Additionally, in the case of vessels restricted in their ability to maneuver (e.g., tug and tow combinations), a Greenpeace vessel positioned or maneuvering near the intended track of that vessel would pose a serious safety threat.

## EXPLORATION PROGRAM ACTIVITIES

22. The safe and successful completion of Shell's 2015 Arctic exploration drilling program will require a careful and coordinated effort among all of the vessels described in this Declaration and the associated exhibits. Each vessel serves a critical role in the program and interference with a single vessel could result in serious safety risks not only for that vessel but for other vessels and their crews. Interference with a single vessel would also likely result in delays that affect the entire program. The following paragraphs describe operations that will be undertaken in Shell's 2015 Arctic exploration drilling program as well as associated safety concerns, the risks presented by potential interference by Greenpeace activists, and recommended safety zones for all of the vessels involved.

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 RRB     - 8

### Chukchi Sea Operations

23. Shell plans to conduct exploration drilling operations in the Chukchi Sea within a prospect known as the "Burger Prospect." The *Noble Discoverer*, *Polar Pioneer*, and associated support vessels will transit through the Bering Strait and into the Chukchi Sea on or about July 1, 2015, and then onto the Burger Prospect as soon as ice and weather conditions allow. Exploration drilling activities could continue through October 31, 2015, and when concluded, the *Noble Discoverer*, *Polar Pioneer*, and associated support vessels will exit the Chukchi Sea. The Chukchi Sea exploration drilling program is described in Exhibits 2, 3, and 4.

24. In addition to the exploration drilling operations in the Chukchi Sea, marine activities will occur in Kotzebue Sound and Dutch Harbor during the season. The ACS and other supporting vessels necessary for oil spill response will moor in Kotzebue Sound during the season. Aviation operations — primarily in Anchorage, Barrow, Dutch Harbor, and Wainwright — will support drilling activities, including transport of personnel to various vessels, and will provide resupply and other logistical support, including search and rescue.

25. The drilling of exploration wells by the *Noble Discoverer* and *Polar Pioneer* requires the placement of a carefully coordinated and planned anchoring system involving 8 anchors, weighing approximately 15 tons each, installed in a circular formation around the drillship/MODU at an approximately 1000 meter radius. A depiction of the maximum anchor radii applicable to both the *Noble Discoverer* and the *Polar Pioneer* is provided in Exhibit 6.

26. The *Tor Viking II*, the *Aiviq*, and the *Ross Chouest* are primarily responsible for conducting the anchor laying for both the *Noble Discoverer* and the *Polar Pioneer*. Anchors for the *Noble Discoverer* will be preset in position prior to the drillship's arrival, whereas the *Polar*

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Pioneer* anchors are carried onboard the MODU. The anchor laying process applicable to both the *Noble Discoverer* and the *Polar Pioneer* is described in the following two paragraphs.

27. Each anchor will be positioned on the seabed together with approximately 305 m of chain/wire extending back towards the drillship/MODU position; an intermediate surface buoy is connected and marks the end of each line. The drillship/MODU is centered in the mooring pattern and each line is sequentially connected to each preset mooring through the execution of a system in which the rig wire is extended from the drillship/MODU and secured. Upon completion of the mooring, the intermediate buoy is submerged. The integrity of this intermediate buoy is essential to the mooring system, and enables safe access for the vessel crews for routine connection/disconnection and emergency recovery. A line runs from the submersible buoy to a ball buoy at the water surface. The process of anchoring all 8 presets is conducted in two stages and involves highly trained personnel handling very large, heavy-duty equipment according to a specific set of established protocols and safety procedures. It is absolutely essential that this process is carried out free of outside interference and crew distractions. It is also absolutely essential that all of the preset equipment is not interfered with prior to drillship/MODU arrival and during the course of drilling operations. Any such interference or distractions pose unacceptable, significant, and substantial safety risks.

28. Both the preset and final anchoring systems are necessarily and constantly monitored, adjusted, and maintained by support vessels operating within and outside of the perimeter of the anchoring system. These support vessels (i) ensure that the integrity of each mooring and associated components remains intact to confirm that the drillship/MODU is secured throughout the drilling operation, and (ii) perform ice management activities at each of the buoys and in the vicinity outside of the perimeter of the anchoring system. If a support

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900   Fax (206) 386-7500*

vessel is blocked, delayed, or interrupted in its ice management or mooring maintenance duties, such interference will directly affect the safety of the drillship/MODU and personnel. Additionally, inspection of mooring components may involve recovery to the vessel's deck, which requires vessel crews to secure the wire/chain and associated equipment, all of which weighs many tons, on deck. This recovery operation requires a direct connection between the support vessel, anchor, and drillship/MODU. Any external interference that restricts vessel movement to manage the loads and vessel position or handling presents unacceptable safety risks to the crew.

29. In addition to the primary rig anchors, other mooring patterns may be pre-laid to support mooring the ACS in the event that it is needed.

30. Shell's plans include an ice management vessels and activities team that will monitor and advise regarding ice that may threaten the *Noble Discover* and *Polar Pioneer*. Any interference with this process poses an unacceptable safety risk and may result in damage to the drillship/MODU with subsequent loss of stability and severe risk to human life, property, and the environment.

31. Drilling Discharge Monitoring ("DDM") will be conducted prior to, during, and upon completion of drilling operations, primarily by the *Harvey Explorer*. The DDM vessel is required to position precisely (often close to the drillship/MODU) to conduct this activity and any interference with this vessel while performing this task could also endanger personnel and equipment.

32. It is essential that all Chukchi Sea operations involved in the pre-drilling, drilling, and post-drilling processes, including anchor handling, primary ice management, secondary ice management, Sound Source Verification, DDM, resupply, waste disposal, containment support,

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900  Fax (206) 386-7500*

oil spill response (in the unlikely event that is necessary), and personnel transport, are carried out free of interference or crew distractions. Any such interference or crew distractions pose serious and substantial safety risks as well as significant risks of delay and logistical complications to the overall project operations.

### Kotzebue Sound Operations

33. Kotzebue Sound will be used primarily as an anchor/mooring location for oil spill response assets and their necessary support equipment. Specific activities will require laying of anchors and moorings, connecting vessels and barges to the anchors and moorings, limited transfer and preparation of equipment and support activities, such as crew change, refueling, and planned vessel maintenance. Interference with these activities by Greenpeace activists could also endanger personnel and equipment.

### Risks Posed by Greenpeace Activists

34. Sea currents generally run at 1 to 3 knots in an East/West direction in the Chukchi Sea. Water depths in the area of our planned operations are relatively shallow and range from approximately 120 to 150 feet. The shallow waters are strongly influenced by meteorological conditions, and winds average 20 to 25 knots in July and August. Advection or "sea" fog can occur in the summer months and, under such conditions, it can be very difficult to detect small craft in time to take avoiding action.

35. The window of opportunity for completing the operations described above is very narrow. Planning for and managing issues associated with annual and multi-year sea ice is an important safety factor for exploration drilling operations the Chukchi Sea. Active ice management in the dynamic environment of the Arctic Ocean will likely be required in order to

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
Main (206) 624-0900  Fax (206) 386-7500

ensure the *Noble Discoverer* and *Polar Pioneer* are able to maintain their surface positions during drilling operations.

36. Ice conditions in the Arctic Ocean require the operator to implement measures to identify, monitor, and mitigate ice-related hazards that might be encountered during drilling operations. These measures, which include procedures that may need to be executed in an emergency situation, ensure an appropriate, phased response to actual and anticipated ice hazards at the drill site. Among other things, these measures include using the primary and secondary ice management vessels to sweep the area around the drillship's hull and the columns of the MODU to keep them clear of ice and prevent ice build-up. Were ice allowed to build up against the hull of the drillship or the columns of the MODU, it could be forced off its anchors or, in a worst case scenario, damage to the drillship or MODU could result. Active ice management may also be also required inside and outside of the perimeter of the drillship/MODU anchoring pattern. A copy of Shell's Ice Management Plan is provided as Exhibit 5, attached to this declaration.

37. In addition to procedures to prevent ice build-up against the hull of the drillship or the columns of the MODU, the operator is required to implement plans to safely suspend (temporarily abandon) the well and escape the location in the event it is determined that ice conditions are such that it is no longer prudent or practical to keep the drillship/MODU moored at the site. When this occurs, procedures have been developed to cease drilling operations, secure the well, recover mooring equipment, and move the drillship/MODU to a safe area until the hazard has passed. These emergency procedures involve multiple large vessels moving around in close proximity to each other and to ice, and include an operation whereby anchor wires are released from anchor chains and either winched back to the vessel or, in the event that

the anchor wires cannot be recovered using the winch, spooled off the winches as the vessel leaves the location.

38. Effective and safe implementation of Shell's Ice Management Plan requires that a significant area around the drillship/MODU remains free and clear of any vessels not involved with the drilling operation. Unauthorized vessels coming in proximity to the drillship/MODU and its attending vessels, or to the perimeter of the anchoring system, would interfere with critical ice management operations or, in an emergency situation, implementation of procedures to escape the location. Such interference would put at risk the safety of the drillship/MODU, its crew, and the surrounding Arctic environment, as well as the safety of those onboard the interfering vessel.

39. Federal law requires lessees conducting exploration operations to implement an Oil Spill Response Plan ("OSRP"). In addition to procedures for recovering oil spilled during operations, OSRPs include procedures to prevent spills from occurring. One such procedure requires the operator to pre-boom the vessels involved in any refueling operation. Any unauthorized vessels intruding in close proximity to the involved drilling operation vessels would likely interfere with the setting of boom and jeopardize the safe completion of refueling operations.

40. Unauthorized vessels intruding within close proximity of a drillship/MODU, its supporting vessels, or the perimeter of the anchoring system could also jeopardize the safe completion of resupply operations. Vessels delivering supplies to the drillship/MODU do not always tie-up to the drillship/MODU; rather, most resupply vessels are dynamically positioned to remain with the drillship/MODU during offloading. Any unauthorized vessels intruding within close proximity would likely interfere with the systems used to position the vessels.

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900   Fax (206) 386-7500*

41. For many and obvious reasons, the close presence of vessels, aircraft such as helicopters or drones, submersibles, and individuals with uncertain and unpredictable motives and intentions, to drilling operations and to drilling vessels and support vessels presents unacceptable and irreparable risks to safety, property, and the environment. Weather in the Arctic is dynamic. Ice conditions are similarly dynamic. Water temperatures are frigid with short survivability times. Tactics such as blockading vessels in transit, boarding vessels, and chaining of individuals to anchors, vessels or other facilities, during operations in the Arctic Ocean seriously degrade the ability to monitor and to respond to ever-present risks, and significantly increase the risks of collisions or allisions, injuries to personnel, damage to essential facilities and equipment, and harm to the environment from a catastrophic event. Additionally, approach to any of the vessels by an underwater vehicle would impede the vessel's ability to navigate and maneuver. Such a vehicle could inadvertently be affected by the continually rotating controllable pitch propeller and wash away or directly into the blades. Any contact or entanglement would cause damage to, and potentially disable, the vessel.

42. The officers and crews of the vessels engaged in the operations set forth above are experienced professionals. If these officers and crews are able to carry out the plans and procedures for Shell's 2015 exploration drilling program without interference, then I am confident that the program will be executed in a safe and successful manner. However, if other vessels, submersibles, aircraft, or individuals should attempt to block or otherwise interfere with any of the operations described above or to distract the crews during critical steps of the operations, then Shell's 2015 exploration drilling program will, at a minimum, be disrupted in unpredictable, and potentially very significant, ways. Given the necessary complexity of the 2015 exploration program, any such disruptions present a real and unacceptable risk of harm to

people, to property, and to the environment. Any attempts by Greenpeace to interfere with these operations by boarding and/or attaching themselves to vessels, placing their vessels or themselves in the path of Shell's vessels, performing fly-by's with aircraft (piloted or otherwise), or piloting submersibles in the vicinity of the operations could seriously endanger the safety of the operations and the lives of crew members and the Greenpeace activists.

43. The presence of Greenpeace activists of unknown and unascertainable experience and intentions in close proximity to Shell's 2015 exploration drilling activities and vessels would create an unsafe and unpredictable situation in which the safety of Greenpeace activists and the employees and contractors of Shell is placed at risk. Greenpeace has a well-established institutional reputation and history for extremist and reckless conduct involving human and marine blockades. These reckless actions are intended to force vessels to stop their lawful activities (thereby causing harm to their lawful interests) for fear of causing bodily injury to Greenpeace activists.

### Necessary Safety Zones for Arctic Operations

44. Based on the information set forth above, in my best professional judgment each of the vessels involved in Shell's 2015 Arctic exploration program will require the following minimum distances (around and below the vessel) free from other vessels, people, or objects while in transit to drilling locations, during drilling operations, and while completing drilling operations and exiting the Chukchi Sea, to ensure that the operations are completed without interference and without endangering human life, property, or the environment. In order to allow for the safe and effective operation of the vessels listed below, the "safety zones" described in paragraph 20 should remain in effect from July 1, 2015 until October 31, 2015, with the following exceptions:

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900  Fax (206) 386-7500*

a. *Noble Discover*: 1500 m. This distance would create a safety zone that appropriately covers the perimeter of the drillship's anchoring system as well as support activities that will be occurring in and around that perimeter.

b. *Polar Pioneer*: 1500 m. This distance would create a safety zone that appropriately covers the perimeter of the rig's anchoring system as well as support activities that will be occurring in and around that perimeter.

45. As was the case with its 2012 exploration program, Shell has asked the Coast Guard to establish "temporary safety zones" around the *Noble Discoverer*, the *Polar Pioneer*, and certain other vessels while operating in specified locations in 2015. But, as was the case in 2012, these 2015 safety zones will not provide sufficient protection from Greenpeace's threatened direct actions because they will not cover all vessels or locations (thereby making those vessels or locations targets) or extend to the full reach of the anchors and buoys placed on and connecting to the OCS seabed to hold in place and stabilize the *Noble Discoverer* and the *Polar Pioneer* while engaged in exploration drilling.

## VESSELS IN PORT AND AVIATION SUPPORT

46. Some vessels in transit to Alaska prior to July 1, 2015 will be moored at various ports located within U.S. jurisdictional waters. In addition, vessels will be moored at various locations in Alaska during the exploration drilling season from July 1, 2015 through October 31, 2015. It is essential for the safe and effective operation of Shell's 2015 exploration drilling program that vessels moored in any U.S. jurisdictional waters remain free of interference by Greenpeace activists.

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900  Fax (206) 386-7500*

47. Shell's 2015 Arctic exploration program will also be supported by aviation operations, as described in the Declaration of Rocky Lee. The safe, ongoing, and effective operation of these facilities and aircraft are critical to a proper and timely execution of exploration drilling activities and is necessary to ensure the continued safety of all personnel involved in the summer drilling program.

48. The Declarations of Michael Battle and Rocky Lee provide additional information regarding vessels in port and the aviation facilities.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Everett, Washington this 8th day of April, 2015.

_____
DAVID GEORGE

STOEL RIVES LLP
600 University Street, Suite 3600 Seattle, WA 98101
Main (206) 624-0900   Fax (206) 386-7500

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 HRH           - 18 -

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2015, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court - District of Alaska by using the EM/ECF system. I further certify that on April 8, 2015, a copy of the foregoing *Delcaration of David George* was served by email and regular U.S. Mail on the following:

> Michael A. Moberly
> Hozubin, Moberly, Lynch & Associates
> 711 M Street, Suite 2
> Anchorage, AK 99501
> Email: mike@akdefenselaw.com

/s/ Ryan P. Steen
Ryan P. Steen (AK Bar No. 0912084)

**STOEL RIVES LLP**
600 University Street, Suite 3600 Seattle, WA 98101
*Main (206) 624-0900    Fax (206) 386-7500*

DECLARATION OF DAVID GEORGE
*Shell v. Greenpeace, Inc., et al.*
Case No. 3:15-cv-00054 RRB            - 19